# CASES ARGUED AND DECIDED

# Supreme Court of Georgia.

## MARCH TERM, 1894.

### JONES v. THE STATE.

1. Where one, by falsehood and artifice, involving co-operation and connivance with a confederate, obtains from a third person a bill of sale to personal property and possession of the property, whereby the owner is defrauded and cheated, an accusation charging the facts specifically, and supported by evidence, is sustainable, the offence committed being a misdemeanor under section 4595 of the code.

2. The accusation was sufficient, both before and after the amendment.

March 5, 1894.  Argued at the last term.

Accusation of cheating and swindling. Before Judge WESTMORELAND. City court of Atlanta. January term, 1894.

The original accusation sets forth that on June 22, 1893, Jones and Martin did by deceitful means and artful practices cheat and defraud Holstein out of a horse, mule, wagon and harness, of the value of $225, in the following way: Jones and Martin, in order to cheat and defraud Holstein, entered into a conspiracy to get said property from him under the plea that they wanted to buy it. To do this they sent a negro, Battle, to Holstein with instructions to say to Holstein that he (the negro) knew a man who wanted to buy his team, the aforesaid property. Holstein, acting in good faith and

believing what the negro said, went with the negro to the corner of Marietta and Forsyth streets in Atlanta, where he said this gentleman had an office. On arriving at this place the negro pointed out Jones as the man who he said wanted to buy the team. This man was a stranger to Holstein. As soon as Holstein stopped, Jones approached him and wanted to know if he wanted to sell his team. Holstein told him he did. Jones asked Holstein what he would take for his team. Holstein told him $250. Jones walked around and inspected the team closely, when Holstein said, "If you want to buy the team and mean business, less money than that will buy them." Jones said he did mean business, and then Holstein told him he would take $225 cash for his team. Jones wanted to know if $200 cash would not buy them. Holstein told him no. Jones then offered Holstein $225 for the team, and proposed to give him two notes for the amount, payable in thirty and sixty days; which was refused. Jones then offered two notes for the amount in fifteen and thirty days. Holstein refused, and stated that he wanted the cash for his team. Jones put his hands in the arm-holes of his vest, and said, "By God, I am no poor man; my real estate will take me through, and my notes will be cashed anywhere." Holstein said, "I don't know you, Mr. Jones, and don't say that you are a poor man. Point me out a man that will cash your notes." Jones then told Holstein that J. W. Martin at 107 E. Simpson street, Atlanta, would cash said notes, and to go down and see him, which Holstein did. He found Martin at the place named, who said he could not cash the notes right then, because he had loaned out all of his money, but might cash them in two or three days. Holstein asked him what discount he would charge for cashing the notes, and he said ten dollars. Martin further said he had cashed Jones' notes before, and he would do it again;

that Jones was all right. Holstein then went back to Jones and told him what Martin said, when Jones said, "He is a damn liar; he has got the money, and we will go down to see him," which they did. When they got to Martin's house, Jones got out first, went in and had a talk with Martin on the verandah, while Holstein stayed in his buggy. After Jones and Martin finished their conversation they came out to where Holstein was, when Martin said, " Mr. Holstein, what will you be willing to pay me if I go borrow the money to cash those notes?" Holstein told him he would give him five dollars in addition to the ten dollars he had agreed to give him. Martin said, "I cannot do that. I will have to pay something for the use of the money, and I want something for myself." Jones then said, "Make it twenty, and I will pay the difference." Holstein then told Martin that he would give him twenty, and Martin said, all right, that he would give him the money on the notes. Holstein then asked Martin where and when he could see him, when Martin said, " Bring the notes here to me to-morrow morning at ten o'clock, and I will give you the money on them." Holstein and Jones then went back to what Jones called his office. After they got back, Jones wanted Holstein to turn over his team to him (Jones) that evening, but Holstein refused, saying he could not get the money on the notes until morning, and he would wait until then. The next morning Holstein drove his team up to Jones' office at the corner of Marietta and Forsyth streets, when Jones presented him with two notes signed, for $230, and insisted on Holstein signing a bill of sale to the team. Holstein objected, saying he did not want to do that; that he would be giving him possession of his team, and him no money. Jones expostulated and kept telling Holstein that he had nothing to do but to take the two notes down to Martin's and get his money; that it

would be all right. After such frequent statements of this kind from Jones, Holstein signed said bill of sale and told Jones that he would go down and see Martin and see if he could get the money, and in the meantime he would drive his team around into the alley until he got back from Martin's. After driving his team around into the alley, Holstein went to see Martin. When he approached Martin for the money, he said that he had not seen the party from whom he was to get the money, and did not have the money, but that he would see said party, and for Holstein to come back at two o'clock and he would have the money. Holstein then ran every step of the way from Martin's house back to where he had left his team, when he found it gone. He saw Jones and asked him where his team was, when Jones said that the man he had sold the team to needed them to go to work, and he let him have them; he said he had sold them to said man for $300. Holstein told Jones what Martin had said about having to come back at two o'clock for the money; and told Jones that he had to have his money or his team right then. Jones then used some slang, and told Holstein not to be uneasy; that if he could not get the money from Martin at two o'clock, he would let him have it himself at four o'clock; that he would go down to Martin's himself as soon as his buggy came. This was near twelve o'clock. Holstein then went and saw Dilda, who told him that a man was trying to sell his team. Holstein then went immediately back to the corner of Marietta and Forsyth streets and got there about one o'clock, when Martin came along and Holstein stopped him and asked him if he was ready to cash those notes. Martin said he had not seen the party yet, and that he had to go off on the one-thirty train; and Martin left Holstein, and he has not seen him since. When four o'clock came, Holstein went to the corner of Marietta and Forsyth streets and

saw Jones, who told him that he had the money but could not get it until in the morning; that he had been to Decatur after it; and to meet him at Block's corner in the morning at nine o'clock, and he would see him and pay him the money. Holstein met Jones next morning, when Jones told him to meet him at twelve o'clock at Mr. Irwin's office, and he would pay him the money. Jones further said that he had seen J. A. Dilda to whom Holstein owed a balance on the team, and that he knew Dilda and Dilda knew him, and Dilda would take his notes for the amount Holstein owed him. Holstein them came to the conclusion that the defendant had swindled him; and he immediately took steps to have him arrested, because immediately after Jones took possession of Holstein's team he sold said horse and mule for $50. Believing that he was selling his team for cash, and believing the representations of defendants made to him were true, and relying also on the conduct of said parties in their reference one to the other in regard to said transaction, as true, and believing that they were acting in good faith in buying his property, Holstein was induced to part with the same. He has never been paid for it, and has been defrauded out of the whole amount by said parties; and said representations and conversations of defendants, and their references to each other, and their said acts and doings, are false and fraudulent, and were known to be so to them at the time, and were made by them with the intention to defraud Holstein.

The demurrer was: According to the accusation the mule, horse, wagon and harness were never delivered to defendant, and the accusation directly and positively negatives any sale or delivery. If there were no delivery and no sale, defendant cannot be guilty of the crime charged, because, according to the charges, he did not gain possession of the property and did not procure any

sale or delivery as the result of any deceitful means or artful practices. After argument the court intimated that he would sustain the demurrer; whereupon the following amendment was offered and allowed: After the property above set out had gone out of the possession of the prosecutor, he still believing and relying upon the statements made by Jones, all of which were made in order to get the possession of the same, and a part of the deceitful means and artful practices used by Jones, he (Jones) again promised to pay for the same, and Holstein trusting thereto ratified and confirmed the transaction and relied upon said promise to pay; whereas in fact Jones did not intend to pay for the property either at the time he got it or at the time of this subsequent promise on his part and ratification of this transaction, all of which, on Jones' part, and on the part of Martin his confederate, was carrying out the original scheme of cheating and defrauding him out of his property. The demurrer to the accusation as amended was on the ground that it is insufficient in law.

WITHROW & DEAN, P. F. SMITH and GAINES & ETHE-RIDGE, for plaintiff in error. LEWIS W. THOMAS, solicitor, and GLENN & MADDOX, *contra.*

LUMPKIN, Justice.

An accusation was preferred in the city court against Jones and Martin. The accused severed, and Jones was put on trial and convicted. He did not move for a new trial, but, by a direct bill of exceptions, alleges that the court erred in allowing, over his objection, an amendment to the accusation, and in overruling a general demurrer, made orally, to the accusation as amended. The reporter's statement sets forth in substance the original accusation and the amendment.

Assuming that Jones did the acts alleged in the accusation, it is, to our minds, a palpable case of being a

common cheat and swindler under the provisions of section 4595 of the code. He certainly used deceitful means and artful practices by which Holstein was defrauded and cheated. It was insisted that if the accused was guilty of any offence, it was simple larceny, inasmuch as the sale was never completed and the property never actually delivered to the accused, and the taking of it from the custody of the owner was without his consent. It may be that some of the elements of larceny were involved in this transaction; but taking as true the allegations of the original accusation, it affirmatively appears that, by his falsehoods and artifices, Jones did obtain from Holstein a bill of sale to the property, and it is also quite certain that it was a part of the scheme of himself and his confederate by a fraudulent trick to get possession of Holstein's wagon and team, with or without his free consent, and to dishonestly dispose of the same to his injury, and that they succeeded fully in so doing. Although the conduct of Jones and Martin may have amounted morally, or even legally, to stealing, it was nevertheless, beyond doubt, cheating and swindling of the most iniquitous character. We therefore think the accusation was sufficient without the amendment. The judge having intimated that he would sustain a demurrer to the original accusation—probably upon the idea that, as it then stood, it charged only the offence of simple larceny, if it charged any offence at all,—the amendment was offered to relieve the accusation of this objection, by alleging that after the property had gone out of the actual possession of the prosecutor, he ratified the taking of it by Jones, but that the latter, in taking the property, was only carrying out the original scheme devised by himself and his confederate to cheat and swindle the prosecutor. The objection to the amendment in the trial court was general, and not based upon any distinct ground. In the argument here no question was raised

as to the power of the court to allow an amendment. Indeed, that was virtually conceded, but it was insisted that there was nothing in the accusation to amend by, and that the amendment offered made a new and distinct case. We think the accusation was good without the amendment, and also are of the opinion that the amendment did not charge a new and distinct offence, but was simply an amplification of the facts embraced in the transaction as a whole. In our opinion it was unnecessary, but certainly it was harmless.

As the accused did not move for a new trial, there can be no doubt that the charges made in the accusation were supported by evidence, and we have no hesitation in sustaining the conviction.        *Judgment affirmed.*